### MARINE TRANSP. CO. v. SHAWMUT S. S. CO.

### LEVENTRITT v. SAME.

(District Court, D. Massachusetts. March 22, 1923.)

Nos. 1885, 2004.

**I. Shipping ⊜⟩56—Charter of four vessels held not separately assignable.**

A charter party, whereby the owner chartered to the charterer four vessels at a stipulated monthly hire for each vessel, beginning from the date of delivery of that vessel, and which required the charterer to deposit a stated sum as security for the hire on the delivery of each vessel, though it might be considered a divisible contract for some purposes, was not a separate contract in respect of each vessel, so that an assignment of the rights of the charterer in respect of one vessel, though it

⊜⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

might possibly have passed an equitable interest, would not entitle the assignee to sue the owner on the charter party but his situation was anal-ogous to that of a sublessee or subcharterer.

2. **Shipping ⬳38—Agreement supplemental to charter held not to relieve against forfeiture for nonpayment of hire.**

An agreement supplemental to a charter party of four vessels, which gave the owner the right to withdraw any vessel from the charter party the hire of which was not paid on the due date, and authorized the owner to apply any portion of the guaranty fund which had been deposited under the terms of the charter to the payment of any hire due, did not contemplate that the guaranty fund must be entirely exhausted before any default in payment of the hire occurred for which the owner could withdraw the vessels from the charter.

3. **Shipping ⬳49(2)—Guaranty fund for charter of four vessels held security for payment of hire on all.**

Where a charter party required the charterer to pay $20,000 when each of the four vessels covered by the agreement was delivered to him as security for payment of the hire of the vessels, and permitted the charterer to withdraw $20,000 in the event of the loss of any one vessel, the guaranty fund thereby created was not limited to the payment of the charter hire for the vessel for which each portion was deposited, but the amount deposited for two vessels, which was all the deposit that ever was made, could be applied to payment of the hire of any of the vessels.

4. **Shipping ⬳49(2)—Charterer's letter held not to defeat owner's right to pay hire from guaranty fund.**

Where a charterer had deposited a guaranty fund for payment of the hire of the vessels, an agreement stated in a letter by the charterer extending the time for the payment of monthly hire, and permitting the owner to use the amount deposited in the guaranty fund without further notice, was not intended to defer the right of the owner to apply the guaranty fund against hire then due, if it preferred to do so, but was intended merely to give the charterer an extension of the time within which he could pay the hire due without being adjudged in default.

5. **Shipping ⬳49(1)—Owner's request vessel be brought home in ballast held not to relieve charterer of hire.**

A request by the owner that a vessel be brought home in ballast, to which no objection was made by the charterer, and which was not shown to have damaged the charterer, or to have been treated by him as a termination of the charter party, does not relieve the charterer from its duty of paying the charter hire.

6. **Shipping ⬳38—Vice president of charterer corporation held to have had authority to release charter.**

Where it appeared in the record that a number of other papers relating to a charter party of four vessels were signed by the vice president of the charterer corporation, and that he took a part in the making of the charter arrangements, those circumstances, with the fact that he was vice president, indicate he was acting within the scope of his authority in signing a document acknowledging the charterer's default and releasing the vessels from the charter party.

7. **Shipping ⬳52—Mere payment of past-due hire does not reinstate charter.**

The mere payment of the charter hire past due would not reinstate a vessel withdrawn from the charter party for default in payment of the hire, in the absence of any indication that the parties intended thereby to reinstate her.

8. **Shipping ⬳52—Charterer held in default in payment of hire for vessel.**

Since the appropriation of a fund given as security for the payment of the hire of a vessel does not cure default in payment of the hire, an assignment of freight in protection of monthly hire then due does not cure the default, nor does a waiver of prompt payment of the hire then due waive prompt payment of the hire for the succeeding month.

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Separate libels by the Marine Transportation Company and by Leo J. Leventritt, as trustee, against the Shawmut Steamship Company for breach of a charter party. Both libels dismissed.

G. Philip Wardner, of Boston, Mass., for libelants.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for respondent.

MACK, Circuit Judge. These are two libels for breach of a charter party dated April 8, 1915, whereby the Shawmut Steamship Company (hereinafter called the owner), chartered to the Interocean Transportation Company of America, Inc. (hereinafter called the charterer), four steamers, namely, the Penobscot, the Seaconnet, the F. J. Lisman (hereinafter called Lisman), and the M. E. Harper (hereinafter called Harper). On May 22, 1915, the charterer purported to assign all its right, title, and interest in the charter party, in so far as it related to the Seaconnet, to the Marine Transportation Company, Inc. (hereinafter called the Marine Company). The libel on account of the alleged breach of the charter party in respect of the Seaconnet is brought in the name of the Marine Company. The charterer was adjudicated a bankrupt on September 27, 1915, and Leo J. Leventritt (hereinafter called the trustee) was on February 24, 1916, duly appointed its trustee in bankruptcy. The libel on account of the alleged breach of the charter party in respect of the Lisman is brought in the name of the trustee.

By the charter party, the owner chartered the four steamships for a period, as to each steamer, of 12 months from the time of its delivery. In article 3 the charterer agreed to pay the owner on the signing of the charter party $5,000 each on account of the charter hire of the first two vessels, and on the delivery of each of these two vessels an additional $2,500; the $7,500 on each steamer was to constitute the first month's hire. The charterer further agreed to pay $7,500 each on the respective deliveries of the other two steamships; this was likewise to constitute the first month's charter hire. Charterer further agreed to pay $7,500 per month for each of the four vessels, beginning one month from the date of its delivery.

Article 3 of the charter party also contained the following provisions:

"It being further understood and agreed that the charterers shall, before the first sailing of each of said respective vessels, deposit with the owner above named the sum of twenty thousand ($20,000) dollars, which shall bear interest at the rate of 5% from the date of such deposit, for the faithful carrying out of each and every of the terms and conditions hereof.

"It being understood, however, that should default exist for a period of five days in the payment of any of the foregoing installments of charter hire, as the same become payable at the times herein set forth, thereupon the owner shall have the privilege and authority of deducting said amount thus due, together with the amount of any and all bills against said vessel which shall be thirty days past due, from the amount thus retained on deposit, which amount the charterers agree to repay and restore to said fund during said current month, and upon failure so to do the owner shall have the privilege in its option of canceling this charter party in so far as it relates to the particular vessel the charter hire or said unpaid bills of which are in default, and of retaining the balance of said fund until all its expenses and damages accruing to

it by reason of such breach of said charter party, relating to such particular vessel, have been ascertained and determined by W. H. Randall, of John S. Emery & Company, of Boston, Massachusetts, whose decision shall be final, and it will then turn over and account to the charterers for the balance, if any, remaining."

By article 13 of the charter party it was provided:

"That should the vessel be lost, freight paid in advance and not earned (reckoning from the date of her loss) shall be returned to the charterers, together with said deposit of twenty thousand ($20,000) dollars after all expenses chargeable to the said steamer have been paid in full.

"The charterers shall be entitled to the benefit of any insurance on any of the vessels (unless such vessel be a total loss, actual or constructive, in which case the charter hire shall cease from the date of such loss) whether under the guise of advances, loans or otherwise."

The Lisman was delivered under the charter party on April 22, 1915, the Seaconnet on April 24th, the Harper on May 29th, and the Penobscot on June 10th. The first sailing of the Lisman took place on May 23d, the Seaconnet on May 31st, the Harper on June 11th, and the Penobscot on June 12th. By a check dated May 22, 1915, the approximate time of the first sailing of the Lisman, the charterer deposited with the owner $10,000 on account of the guaranty fund. For the balance of the $20,000 the charterer gave its note for $10,000. This note appears to have been renewed from time to time; the last renewal being a demand note for $10,000, dated July 16, 1915, which was never paid. By two checks, for $10,000 each, dated May 28, 1915, just before the sailing of the Seaconnet, the charterer deposited with the owner $20,000 on account of the guaranty fund. The Harper and Penobscot were permitted by the owner to sail without deposit of any additional money by the charterer with the owner for the guaranty fund.

The charter hire was paid to the owner on the Lisman and on the Seaconnet for two months, and on the Harper and on the Penobscot for one month, in each case from the respective deliveries of the vessels.

On June 19, 1915, the charterer entered into the following agreement with the owner:

"Whereas, by the terms of a contract entered into between the parties hereto on the 8th day of April, 1915, relating to the charter of certain steamers, therein named, it is provided among other things that should default exist for a period of five days in the payment by the charterer of any of the installments of charter hire therein named, the owner shall have the right of making good said default from certain amounts to be held on deposit by it;

"And whereas, the charterer has failed to perform certain essential terms of said contract of April 8, 1915;

"And whereas, the owner is willing to continue said contract notwithstanding said failure to perform, but upon certain terms hereinafter set forth:

"Now, therefore, in consideration of the waiver by the owner of the right of cancellation of said contract and of the mutual promise herein contained, it is mutually agreed as follows:

"1—In the event of any failure by the charterer to pay any installment of charter hire on the due date, the owner may at its option cancel said contract of April 8, 1915, in so far as it relates to the steamer, charter hire of which is in default.

"2—The owner agrees to continue all of said steamers in the service of charterer until failure by the charterer to pay any installment of charter hire on the due date."

The third month's hire for the Lisman fell due on June 22d, for the Seaconnet on June 24th, and the second month's hire for the Harper on June 29th. The charterer, not having paid the hire for these vessels when due, wrote the owner on June 26th as follows:

"In consideration of extending the time of payment of monthly hire now due steamers Seaconnet and F. J. Lisman, as mentioned below, we hereby solemnly agree and pledge ourselves to pay you the monthly hire of $7,500 due on steamship M. E. Harper between July 1 and 5, 1915, and not later than the 5th, and we likewise agree to pay you $7,500 hire now due from steamship Seaconnet not later than July 15, 1915.

"In abeyance and for protection of monthly hire now due steamship F. J. Lisman, we inclose assignment of full freight from London to Boston as specified in the assignment. In consideration of the above we hereby willingly and as a part of this agreement release to you the trust fund of $30,000 cash as far created for your use without further notice, and from which you are authorized and directed to appropriate such moneys as may be due for charter hire remaining unpaid, said trust fund to be re-established in full before steamers to which it applies enter upon another outward voyage.

"We further agree that all interest is hereby waived on said trust fund and that interest hereafter shall not begin or become due on any part of said trust fund until the fund in full of $80,000 has been paid to you in accordance with charter party, and the same shall then begin to draw interest for our account at the rate of 5 per cent. from the date of the establishment of the full trust fund of $80,000 and no interest shall be due us or commence until that time.

"This letter is an agreement in itself, and is in no way to be construed as changing or breaking any of the conditions or obligations by which we are bound under the original charter party."

On July 12, 1915, counsel for the Marine Company wrote the owner as follows:

"We represent the Marine Transportation Company (Inc.), which is composed partly of the stockholders and directors of the Interocean Transportation Co. of America, Inc., and partly of outside interests. We also represent the outside interests. The Marine Transportation Co. (Inc.) has taken an assignment of the charter by you of four vessels to the Interocean Transportation Co. of America, Inc., in so far as the said charter relates to the steamship Seaconnet. Our clients understand that the sum of $20,000 provided for in the said charter as security for the payment of rent, etc., upon the steamship Seaconnet has been paid you by the Interocean Transportation Co. of America, Inc., and also that all rent now due has been paid, except the installment of rent which was due on or about the 24th day of June, 1915. Our clients understand that the said rent is in arrears, but that the Interocean Transportation Co. of America, Inc., has kept all of its other agreements with you promptly, in so far as they relate to the said steamship Seaconnet.

"We would request from you an expression of your attitude toward the Interocean Transportation Co. of America, Inc., and towards our clients with reference to the said charter, in so far as it relates to the steamship Seaconnet. This is desired in order that we may be in a position to protect you, as well as our clients, in the future.

"In the event that you should contemplate taking any proceeding or action because of the nonpayments of any rent, we would request that due notice be given us of such contemplated action on your part in sufficient time to enable us to arrange for such protection.

"Thanking you for your courtesy, we beg to remain."

To the above letter the owner replied as follows:

"Steamship Seaconnet: We have your favor of yesterday and contents duly noted.

"The Interocean Transportation Co. paid us in part, not in full as agreed, certain amount of cash as security for the payment of charter hire on the various steamers that we have under charter to them, with the understanding that, if payments for charter hire became in arrears, this fund could be drawn upon for such delinquent charter hire, and that the same would again be made good before the expiration of 30 days; otherwise, our option to cancel charter.

"Some time ago we notified the Interocean Transportation Co. and received their written consent to devote such part of this fund as we desired for charter hire on one or two steamers in arrears; therefore the fund is not now in full as a security fund.

"The charter hire was due on the steamship Seaconnet June 24, 1915, and will again become due July 24th.

"We cannot continue to run this steamer with these people unless they pay the charter hire and keep up their obligation agreed to in charter party, that on each steamer a deposit of $20,000 cash shall be paid as security for future payment of hire.

"We have done everything possible to make matters easy for the Interocean Transportation Co. to continue the charter, but, unless matters are speedily adjusted in conformity with charter party, we shall have to take the boats away from them, and cannot let the steamship Seaconnet go for them another voyage until these financial matters are adjusted."

It appears that on June 28th the owner applied $7,500 of the guaranty fund to the payment of the third month's hire of the Lisman, $7,500 to the payment of the third month's hire of the Seaconnet, and $7,500 to the payment of the second month's hire of the Harper. On July 22d, the charterer applied $7,500 of the fund to the payment of the fourth month's hire of the Lisman, thereby exhausting the fund. The charterer did not, on or before July 5th, pay any of the hire due on the steamer Harper, nor did the charterer, on or before July 15th, pay any hire due in respect of the steamer Seaconnet, apart from its release of the guarantee fund as provided in its letter of June 26th.

On July 6th, the owner wrote to the charterer that:

"Owing to your failure to make good your promises and written agreements regarding monthly charter hire, we now consider that we have an interest in seeing that these boats [Seaconnet and Harper] get homeward business, and we shall have to take the matter in hand and act upon your failure to perform the charter. * * * We are exceedingly sorry that you have failed us at every turn, even although we have tried our best to meet the situation and certainly have been very indulgent. We would thank you not to charter the Harper or Seaconnet home without conferring with us."

It appears that the owner was fearful of the Seaconnet being detained in Great Britain if she took on cargo from Scandinavian ports, which might be suspected of German origin, and that the owner consequently requested that the Seaconnet return in ballast. It appears that on July 17th the charterer informed the owner that they had cabled the Seaconnet to ascertain just when she was ready to leave, and had instructed her to carry ballast if she could not get permission for the cargo. The charterer claims that a cable was also sent by the owner to the master of the Seaconnet to the same effect.

From early in July until the owner canceled the charter party on August 16th, there was considerable correspondence between the own-

er and the charterer, in which the owner complained that the charterer was not fulfilling its contract. On July 29th an acknowledgment of default in respect of the steamers Lisman and Seaconnet was obtained by the owner in the following form:

"New York, July 29, 1915.

"We hereby acknowledge default of payment of charter hire due the steamers F. J. Lisman and the Seaconnet; also in default of trust fund provided for in charter party beyond the 30-day provision. Therefore we hereby release the Shawmut Steamship Co. and said steamers, from this date, from all future obligations and claims upon said steamers, and acknowledge the cancellation of the charter party in so far as it applies to the charter of these steamers.

"And we hereby agree to assume all debts and liabilities as provided for in charter party until the said steamers are redelivered to the owners in like good order in the United States on termination of present voyages.

"[Signed]   Interocean Trans. Co.,
"By B. L. Stafford, V. P.

"Witness: Wm. H. Randall."

On August 16th the owner telegraphed the charterers as follows:

"Lisman sails to-morrow. Your complete failure to respond with payments for rent and guaranty fund necessitate chartering elsewhere. Immediately canceling charter with you under your release."

On the same date the owner wrote the charterers as follows:

"The Lisman will undoubtedly be discharged some time to-morrow forenoon, and will then proceed to New York to discharge balance of cargo, and we shall take redelivery of her there. The Seaconnet is making a few repairs, and probably Mr. Trowbridge has communicated with you to-day regarding the same and when she will be likewise ready for redelivery. We have wired you to-day that, owing to your complete failure to comply with the conditions of charter party, which is thereby canceled, and likewise to respond with charter hire on three steamers nearly a month overdue, and with no guaranty fund in hand, it necessitates chartering the boats elsewhere immediately, which we shall have to do without further notification under your signed release to us. Unless we receive from you in the mail to-morrow morning a remittance for balance of charter hire due the Seaconnet, we shall be obliged to take immediate action to protect this company in the interests of the indebtedness that you owe us, not only on this boat, but on the Harper also."

On August 24th the charterer paid the owner $7,500 as hire for the Seaconnet. The owner contends that this hire was paid because it was then due, and because legal proceedings had been threatened if it was not paid promptly. The charterer, on the other hand, contends that it was paid with the understanding that the Seaconnet would be restored to and continued under the charter party.

[1] 1. The assignment made on May 22, 1915, did not, in my judgment, create a right against the owner under the charter party. Although the charter party of April 8, 1915, may be considered a divisible contract for some purposes, the charter party was not a distinct and separate contract in respect of each vessel, and while the assigning of the rights of the charterer in respect of the Seaconnet may possibly have passed an equitable interest, this equitable interest would not entitle the assignee to sue the owner on the charter party. The situation is analogous to that of a sublease or subcharter, which does not give the sublessee or subcharterer a direct right against the owner, in the absence of the owner's consent amounting to a novation.

[2] 2. But I am further convinced that the charterer was in such default under the charter party, in respect of the Seaconnet, that the owner was within its rights in withdrawing the vessel. Ordinarily, the mere giving of security, and the application of that security to the payment of the indebtedness when due, would not relieve the debtor from the consequences of his default. It may possibly be urged, in view of the language of article 3 of the original charter party, dated April 8, 1915, that the owner had no right to terminate the charter party for the nonpayment of charter hire, but that its only right in this respect was, after the default had continued for five days, to pay the hire out of the guaranty fund, and if the charterer did not restore to the fund the sum so appropriated within 30 days, then to terminate the charter party as to the vessel in default. Be this as it may, it would seem clear that under the agreement of June 19, 1915, the owner was given the right to withdraw any vessel from the charter party, the hire of which was not paid on the due date. By its letter of June 26th the charterer agreed to pay the $7,500 hire then due on the steamer Seaconnet not later than July 15, 1915. This the charterer did not do. The fact that the owner had security in the guaranty fund for the payment of the hire when due did not relieve the charterer from its duty to pay the hire as due. It was not, in my judgment, contemplated by the parties that the guaranty fund, which was already $50,000 in arrears, should be utterly depleted, and no additional funds paid in, whether as hire or to the guaranty fund, until after the vessels entered upon their outward voyages. Although the agreements and letters of the parties are not clearly drawn, and their meaning is not always plain, still it seems to me that the fair interpretation to be given to the agreement of June 26th is that, although it was intended that the guaranty fund could be applied by the owner without further notice to the payment of any hire due, still it was contemplated that the hire should be paid when due, since it is not to be assumed that the parties contemplated that the guaranty fund might be entirely exhausted without any default occurring. The provision in the letter of June 26th that the trust fund was to be re-established in full before steamers to which it applied entered upon another outward voyage did not refer to the return of moneys taken by the owner from the $30,000 fund and applied to hire in arrears, but referred to the re-establishment of the full $80,000 guaranty fund, which was $50,000 in arrears at the time the letter of June 26th was written.

[3] 3. Under the original agreement, as well as the subsequent modification thereof, it was intended that the guaranty fund should be held as security for all the vessels delivered under the charter party. True, payments to the fund were to be made before the first sailing of each vessel, and a proportionate part to be returned on the loss of any vessel, inasmuch as the amount of security to be retained naturally would depend upon the number of vessels under the charter party at any one time. It is, however, not to be assumed that it was intended that the owner should be unable to use the guaranty fund in respect of the Penobscot and Harper, because no specific installment

was paid to the fund at the time of the delivery of the Harper and Penobscot. The applications made of the guaranty fund by the owner were, it would appear, therefore, not improper.

[4] 4. It is further urged that, in view of the charterer's letter of June 26th, the owner had no right to apply, as it did, from the guaranty fund on June 28th $7,500 in respect of the Harper, and $7,500 in respect of the Lisman. Although the intention of the parties is not clearly expressed, I am of the opinion that the agreement of June 26th was not intended to defer the right of the owner to apply the guaranty fund against hire then due, if it preferred so to use the fund, but was intended merely to give the charterer an extension of time within which he could pay the hire due without being adjudged in default. However, any premature application of the guaranty fund would seem to be entirely without prejudice to the charterer, particularly in view of the fact that it was expressly agreed in the letter of June 26th that no interest should be paid on the guaranty fund.

[5] 5. Furthermore, the contention of the charterer that it was relieved from paying hire by reason of the request of the owner that the Seaconnet be brought back in ballast seems to be without merit. In the first place, these requests were not acted upon until after July 15th, when the charterer was, in any event, in default, and the owner was endeavoring to have the ship brought back to its possession. Even if any minor breach in this connection could have been established, it is not clear that there was any damage. Moreover, there is no indication that the charterer intended to treat such breach as a termination of the charter party, and therefore the charterer would in no circumstances be relieved from its duty of paying charter hire.

[6] 6. Whether or not there was consideration or authorization for the release executed on July 29th in respect both of the Seaconnet and Lisman by Mr. Stafford, vice president, on behalf of the charterer, the document did acknowledge the charterer's default; it accords with the interpretation herein given to the agreements. However, I am not impressed with the suggestion that Mr. Stafford was not empowered to sign this release or acknowledgment. It appears in the record that a number of other papers were signed by Mr. Stafford, and that he did take a part in the making of charter arrangements. In view of these circumstances, and the fact that he was vice president, it would seem fairly clear that he was acting within the scope of his authority.

[7] 7. The evidence is conflicting regarding the circumstances under which the $7,500 was paid on August 24, 1915. There is no writing indicating that the parties intended thereby to reinstate the Seaconnet under the charter party. The court is not satisfied that there was any such agreement. The mere payment of the charter hire past due would not so reinstate the Seaconnet.

[8] 8. The charterer was clearly in default in the payment of the hire on the Lisman, unless it can be said that such default was cured by reason of the use of the guaranty fund by the owner for the payment of the hire, or by reason of the assignment of the freights under the charterer's letter of June 26th. As has been heretofore stat-

ed, the mere appropriation of a fund given as security for the payment of the hire does not cure the default. The assignment of freight was not payment of the hire, but merely, to use the language of the charterer's letter, "in abeyance and protection of monthly hire" then due. Possibly the acceptance of charterer's letter of June 26th should be regarded as a waiver of the prompt payment of the hire due on June 22d, but it could not be considered a waiver of the prompt payment of the hire due on July 22d. And I am confirmed in this opinion by Stafford's acknowledgment of the default on July 29th.

Both libels, therefore, must be dismissed.