ARNOLD BERNSTEIN SHIPPING CO., Inc. v. TIDEWATER COMMERCIAL CO., Inc.

No. 3075.

United States District Court
D. Maryland.

June 22, 1949.

Niles, Barton, Morrow & Yost, of Baltimore, Md. (Charles E. Quandt, of Baltimore, of Counsel), Hunt, Hill & Betts, of New York City (John W. Crandall, Robert M. Donohoe, and Bernard A. Finkel, of New York City, of Counsel), for libellant.

Ober, Williams, Grimes & Stinson, of Baltimore, Md. (Southgate L. Morison and William A. Grimes, of Baltimore, of Counsel), for respondent.

COLEMAN, Chief Judge.

The single question presented for decision is whether one party to a charter may require the other party to arbitrate their differences arising from the agreement, which contains an arbitration clause.

On August 30, 1948, the Arnold Bernstein Shipping Company, Inc., a New York corporation, filed a libel in this Court against the Tidewater Commercial Company, Inc., a Maryland corporation, claiming damages for alleged breaches of a charter party dated November 22, 1947 whereby the S. S. Continental, formerly the Tidewater, was chartered to the libellant for a stipulated period at the rate of $76,000 per month (subsequently reduced to $72,000). The charter party warranted (1) that the vessel had a dead weight capacity of about 11,000 tons of 2,240 pounds each, whereas the Shipping Company claims that inspection showed the vessel's capacity was not more than 6,667 tons or 4,333 tons less than the warranted dead weight capacity; (2) that the vessel was capable of steaming, fully laden, under good weather conditions, at a minimum speed of 11.5 knots on consumption of about 50 tons of the

950

best grade of fuel oil per day, whereas the Shipping Company alleges that the vessel's consumption was some 60 tons of such oil; (3) that there would be available to the charterer 32,000 cubic feet of refrigerator space, about 1,800 cubic feet of which would be available for commercial use, whereas the vessel's refrigeration facilities were found not to be in operating condition with the result that no refrigerated cargo space was available; and (4) that the vessel was equipped with facilities to supply hot and cold running water to all of her staterooms, whereas the rooms on A and C decks had no hot running water. As a result of these alleged breaches of the warranty, libellant claims damages estimated to be approximately $234,000, no part of which has been paid.

The Shipping Company in its libel also petitioned this Court to direct Tidewater to proceed to the arbitration of the differences arising from this charter party, pursuant to the provisions of Section 8 of the United States Arbitration Act, 9 U.S.C.A. § 8, in the manner provided by Clause 17 of the charter party which provides "that should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men." Tidewater answered, denying the alleged breaches of the charter party, and resisting arbitration on the ground that the libellant is not the present charterer of the vessel and therefore is not a proper party to petition for arbitration. Libellant has also asserted by separate petition its rights to have Tidewater required to proceed to arbitration, to which Tidewater has filed a separate answer resisting arbitration on the same ground as set forth in its answer to the libel.

The following undisputed facts are pertinent to the issue involved: On January 23, 1948, libellant, which will hereinafter be referred to as the Shipping Company, assigned all of its rights and obligations under the charter to the Arnold Bernstein Steamship Corporation, hereinafter referred to as the Steamship Company. To this assignment, the respondent, hereinafter referred to as Tidewater, expressly consented in writing on January 26, 1948, and released the Shipping Company from all liabilities under the charter. On April 15, 1948, authorized representatives of the Shipping Company and the Steamship Company agreed orally upon cancellation of the first assignment, and reinstatement of the former company as charterer of the vessel. A written agreement to this effect was executed on May 11, 1948, but was dated April 15, 1948, in order to conform with the date when the oral agreement for such reassignment was actually entered into.

While distinct corporate entities, the two Bernstein Companies were under the same management and general ownership and control. Arnold Bernstein was president of the Shipping Company. He and his wife were the sole stockholders. He also had been president of the Steamship Company until May, 1948, after which he remained as a director of it and owner of 50% of its stock. The purpose of forming the Steamship Company was in order that Mr. Bernstein might have a separate agency acting for the War Shipping Administration and operating vessels for them. The Shipping Company retained its separate agency for the Orbis Steamship Corporation. In April, 1948, the Steamship Company decided to return all charter contracts to the Maritime Commission and to discontinue its charter business. However, with respect to the S. S. Continental it was agreed that instead of cancelling the charter for that vessel, the Shipping Company, which had originally signed the charter, should reassume it. As a matter of fact at the time the charter was originally executed Tidewater's president was rather indifferent as to which of the two Bernstein companies actually became the charterer. It was the responsibility of Mr. Bernstein that Tidewater relied upon and he controlled both companies.

This assignment back to the Shipping Company was sent by the latter to Tidewater for its formal written acceptance on May 13, 1948, but Tidewater has refused

to execute or to recognize it. It admits the validity of the original assignment to the Steamship Company and also the right to sublet the S. S. Continental to the Shipping Company for the purpose of the vessel's operation, but insists that with respect to matters concerning the charter party itself, Tidewater has a right to look solely to the Steamship Company as the present charterer, and that therefore only the Steamship Company can petition for arbitration. In other words, Tidewater takes the position that the Shipping Company is not entitled to invoke the arbitration clause because the Steamship Company had no right to assign the charter back to the Shipping Company without consent of Tidewater, which has never been obtained, and that, therefore, the Shipping Company is not to be treated as the charterer of the vessel even though, by mutual understanding, the Shipping Company was recognized as the party to make, and which has been making the required payments to Tidewater under the charter. Tidewater's position is that the second assignment was an attempted complete novation, since it substituted the Shipping Company for the Steamship Company, and since Tidewater did not consent thereto, as respects Tidewater it is a nullity; and that, therefore, whatever may be the rights of the assignee, the latter is not entitled to enforce a warranty under the contract, since there is no privity between the assignee and the third party, the present libellant.

The Shipping Company's position is as follows: It contends first, that the second assignment is valid without Tidewater's consent, since there is no prohibition in the charter against its assignment and the charter was not a contract involving personal confidence or trust; and second, that assuming that this second assignment required Tidewater's consent, Tidewater is to be treated as having consented because after being advised that the Shipping Company had taken over the charter from the Steamship Company and being requested thereafter to send to the former all bills for charter hire and other disbursements payable by the charterer under the charter party, Tidewater did so and received all such payments without objection.

Nothing is said in the charter party about assignment. A subletting is made permissive by express provision in it. However, the reassignment, which, by its language, purports to be a complete novation, is not the same as a subletting. The charter party was executed in New York and, therefore, its terms, including the legal effect of the arbitration clause, are to be governed by New York law. The New York law also governs the reassignment because it was executed in New York. We find under New York law that if a contract be assignable, that is, if it is not of a personal character, the assignee may avail himself of the rights afforded by an arbitration clause, contained in the contract. See Lipman v. Haeuser Shellac Co., 289 N.Y. 76, 43 N.E.2d 817, 142 A.L.R. 1088; In Matter of Hosiery Mfgrs' Corp. v. Goldston, 238 N.Y. 22, 143 N.E. 779; In matter of Lowenthal, 199 App.Div. 39, 191 N.Y.S. 282, affirmed 233 N.Y. 621, 135 N.E. 944. However, none of these cases, and no other New York decisions to which we have been referred which are germane to the point here in issue, deal with charters of vessels. But even if we assume that the charter in the present case is of such a personal character as to be unassignable per se under New York law, so as to affect Tidewater without Tidewater's assent to the assignment, we find that Tidewater must be treated as having assented thereto. This assignment, by its express terms, cancelled the first one, and reinstated libellant as charterer. Tidewater admits delivery of the vessel on May 6, 1948, to the Shipping Company, that is, after this second assignment, and also that, subsequently, at the latter's request, it rendered its bills and invoices to and accepted payment from the Shipping Company. Tidewater further admits that on April 16, 1948, it executed an addendum to the charter party reducing the charter hire to $72,000 per month, and extending the time for delivery of the vessel, although neither the name of the Shipping Company nor of the Steamship Company appears on this addendum. Tidewater's general manager and treasurer admitted willingness to agree to this second assignment, but wanted to take the matter up with the president

of the Company who was in Europe, and the latter official, in turn, wanted to take the matter up with his son, with the result that no definite answer was ever given. However, it is undisputed that the reassignment had been sent to Tidewater promptly after its execution on May 11th; also, as already stated, that the Shipping Company had written Tidewater, advising that it had taken over the charter from the Steamship Company and requesting that thereafter all bills for charter hire as well as for other disbursements payable by the charterer, be sent to it, the Shipping Company; that this was done; and that the Shipping Company paid Tidewater, and Tidewater continued to accept these payments without any objection or suggestion that it still considered the Steamship Company as charterer, until arbitration was pressed for by the Shipping Company.

■ As to whether the conduct of Tidewater, as above set forth, was such as in law to amount to assent to the assignment here in issue is to be governed by Maryland law, since Tidewater's relations with the Shipping Company were carried on from Baltimore by Tidewater's general manager.

■ Waiver is the voluntary surrender, of a known right by one who has so acted that his conduct either expresses or implies that he has surrendered the right. "Waiver" and "estoppel" are often used synonymously although they are not necessarily one and the same, but the doctrine of estoppel lies at the foundation of the law of waiver because estoppel arises as a result of the voluntary conduct of one party, whereby he is precluded from asserting a right as against another person who has, in good faith, relied upon such conduct and has been led thereby to change his position for the worse. Rody v. Doyle, 181 Md. 195, 29 A.2d 290; Wright v. Wagner, 182 Md. 483, 34 A.2d 441; Price v. Adalman, 183 Md. 320, 37 A.2d 877; Armour Fertilizer Works, Division of Armour & Co. of Delaware v. Brown, 185 Md. 273, 44 A.2d 753; Bracey v. Luray, 4 Cir., 161 F.2d 128, certiorari denied 332 U.S. 790, 68 S.Ct. 98, 92 L.Ed. 372; Maryland Casualty Co. v. Gates, 4 Cir., 290 F.

65, certiorari denied 263 U.S. 708, 44 S.Ct. 36, 68 L.Ed. 517; Manufacturers Casualty Insurance Co. v. Roche, D.C., 25 F.Supp. 852.

In Wright v. Wagner, supra, a mortgagors' guarantee had assumed the mortgage as part of the purchase price and the mortgagee, by letter, granted the mortgagors' assignee a renewal of the mortgage and subsequently, over a period of years, without the knowledge or acquiescence of the original mortgagors, the mortgagee granted other extensions of the mortgage to the mortgagors' assignee who made payments as to principal and interest during such period. It was held that the mortgagee's conduct amounted to a relinquishment of his right to proceed against the mortgagors, i.e., a waiver and an equitable estoppel to assert that right, since otherwise, an injustice would result to the mortgagors. The Court said 182 Md. 483 at pages 490-493, 34 A.2d at page 445: "In the view we take of this case it is not necessary to pass upon the question of novation, as the decision here rests squarely upon the principles of equitable estoppel and waiver. These principles are closely interrelated and the facts of this particular case strongly support both.

\* \* \* \* \* \*

"This course of dealing between the parties in relation to the mortgage debt in question fully justified the Wrights in the belief that Wagner had ceased to look to them as his obligors subsequent to his letter of April, 1929, and their failure to take any steps to protect themselves against default by Belsky in continuing payments which he had undertaken to make Wagner, can, in fairness, be attributed only to Wagner's conduct and attitude in the matter.

"This amounted to both a relinquishment of his right to proceed against them under the covenants of the original mortgage, thus constituting a waiver as above defined, and of equitable estoppel to assert that right. To permit the mortgagee to repudiate the reasonable understanding which his course of dealings created would, in the language of this court in the Berman case, supra [East End Loan & Savings Ass'n v. Berman, 170 Md. 536, 185 A. 332],

result in an injustice to the appellants which will not be countenanced in equity."

■ The Maryland law with respect to waiver and estoppel is not different from that in other jurisdictions, generally speaking. For example, in Denton v. Brocksmith, 299 F. 559, a decision of the Circuit Court of Appeals for the Fifth Circuit, it was held where defendants with full knowledge of an assignment to plaintiffs of a contract to drill oil wells, failed to object and allowed work to proceed to completion, they were to be treated as having ratified the assignment. The Court said, 299 F. page 561: "The defendants must be held to have ratified Hitchcock's assignment of the contract to the plaintiffs, because with full knowledge they failed to object, and allowed the work to proceed to completion. It is therefore not worthwhile to determine whether as an original proposition the contract was rendered nonassignable by reason of personal confidence reposed by the defendants in Hitchcock."

■■ Applying the above principles to the facts in the present case, it is clear that Tidewater cannot be permitted to deny recognition to the Shipping Company, libellant, as the present charterer and therefore as the one entitled to invoke the arbitration clause in the charter. It is true that Tidewater never actually assented to the assignment of the Steamship Company's rights under the charter back to libellant. But its delay and equivocation with respect to advising libellant definitely as to whether or not it would be a party to a complete novation may be sufficient ground in and of itself on which to sustain libellant's position. That is to say, laches may in and of themselves be sufficient ground for waiver or estoppel, for relief should not be granted a party who has been guilty of such delay in asserting its rights after they have arisen as to make the assertion unjust. However, there is more in the present case on which to rest our conclusion, which is the fact that Tidewater continuously recognized for all practical purposes the substitution of libellant for the Steamship Company by accepting without objection all payments due under the charter as and when made by libellant and never raised any question about libellant's status by virtue of this assignment until libellant demanded arbitration of the various disputes that had arisen under the charter. We believe, just as was found to be true in Wright v. Wagner, supra, from which we have quoted, that it is not necessary to pass upon the question of novation as our decision here may be rested squarely upon the principles of equitable estoppel and waiver. Clearly, it would be inequitable now to deny libellant the right to claim that it has the status of charterer, because libellant was justified in relying upon Tidewater's conduct and in believing that Tidewater recognized libellant as the charterer with all of the rights granted to the charterer by the charter party. With such belief, libellant has paid to Tidewater under the charter more than $300,000.

We find nothing in conflict with our conclusion on this point in the cases to which we have been referred by counsel for Tidewater, including the English decision, Cottage Club Estates v. Woodside Estates Company, [1928] 2 K.B. 463; The Barnes, 221 F. 416, a decision of the Circuit Court of Appeals, Second Circuit, and Marine Transportation Company v. Shawmut Steamship Co., 287 F. 547, a decision of the District Court for the District of Massachusetts. The latter decision is so clearly dissimilar on its facts that an analysis of that case would serve no useful purpose. The Barnes holds merely that (1) a time charterer who sub-charters to another has no right of action against a vessel's owner for damage to cargo owned by the sub-charterer; and (2) a sub-charter, even though embracing the same terms as the original charter, creates no contract relationship between the sub-charterer and the owner. Clearly, there is nothing in that decision which bears directly upon the precise question before us.

Similarly, in the Cottage Club Estates case, the question of waiver or estoppel was not involved.

■ For the reasons herein given, the Court will sign an order directing Tidewater, the respondent, to proceed with

arbitration of the disputes pending between it and the libellant in the manner provided by Clause 17 of the charter and in accordance with the provisions of 9 U.S.C.A. § 8.